UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHRISTIAN MASTRONARDI, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| KILOLO KIJAKAZI, | * | Civil Action No. 20-cv-11181-ADB |
| *Acting Commissioner of the Social* | * | |
| *Security Administration*, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Plaintiff Christian Mastronardi ("Claimant") brings this action pursuant to section 205(g)

of the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), challenging the final decision of the

Commissioner of the Social Security Administration (the "Commissioner") denying his claim for

Title II Disability Insurance Benefits ("SSDI").[1]  Currently pending before the Court are

Claimant's motion to reverse the Commissioner's decision denying his SSDI, [ECF No. 16], and

Defendant Kilolo Kijakazi's (the "Acting Commissioner") cross-motion for an order affirming

the decision, [ECF No. 22].  For the reasons set forth below, Claimant's motion is <u>DENIED</u> and

the Acting Commissioner's motion is <u>GRANTED</u>.

---

[1] Ms. Kijakazi is substituted for her predecessor, Andrew Saul.  <u>See</u> Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

# I.    BACKGROUND

## A.    Statutory and Regulatory Framework: Five-Step Process to Evaluate Disability Claims

"The Social Security Administration is the federal agency charged with administering both the Social Security disability benefits program, which provides disability insurance for covered workers, and the Supplemental Security Income program, which provides assistance for the indigent aged and disabled." Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42 U.S.C. §§ 423, 1381a).

The Act provides that an individual shall be considered to be disabled if he or she has an

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); see also 42 U.S.C. § 1382c(a)(3)(A).  The disability must be severe, such that the claimant is unable to do his or her previous work or any other substantial gainful activity that exists in the national economy.  See id. § 423(d)(2)(A); 20 C.F.R. § 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step process, which the First Circuit has explained as follows:

> All five steps are not applied to every applicant, as the determination may be concluded at any step along the process.  The steps are: 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey, 276 F.3d at 5 (citing 20 C.F.R. § 416.920).

### B.    Procedural Background

Claimant filed his application for SSDI in February 2017.  [R. 16, 191].[2]  He alleged that he became disabled on December 30, 2008.  [R. 16].  His date last insured under the SSDI program was June 30, 2014.  [R. 17].  This date is relevant because an individual must become disabled during the period that he is insured by the program to qualify for SSDI benefits.  See 20 C.F.R. § 404.131.

The Social Security Administration (the "SSA") denied Claimant's application for SSDI benefits on June 1, 2017, and again upon reconsideration on July 28, 2017.  [R. 120–22, 125–27].  Thereafter, Claimant requested an administrative hearing, [R. 128–29], and a hearing took place before Administrative Law Judge ("ALJ") Ellen Parker Bush on April 24, 2019.  [R. 33–69 (hearing transcript)].  Claimant, who was represented by counsel, appeared and testified at the hearing.  [R. 33, 38–59].  Vocational Expert ("VE") Jane A. Gerrish[3] also appeared and testified at the hearing.  [R. 16, 59–68].  On July 3, 2019, the ALJ issued a decision finding that Claimant was not disabled.  [R. 25].  The SSA Appeals Council denied Claimant's Request for Review on April 20, 2020.  [R. 1–3].  On June 19, 2020, Claimant filed a complaint with this Court, seeking review of the Acting Commissioner's decision pursuant to 42 U.S.C. § 405(g).  [ECF No. 1].

### C.    Factual Background

Claimant was 41 years old at the time of his hearing before the ALJ.  [R. 38].  He graduated high school and has vocational training as an electrician.  [R. 40].  For several years he worked as an electrician helper and as a journeyman electrician but stopped working in that field

---

[2]  References to pages in the Administrative Record, which were filed electronically at [ECF No. 14], are cited as "[R. __ ]."

[3] Although the VE's name is transcribed as "Garrish" in the hearing transcript, the Court adopts the spelling from her resume and the ALJ's opinion, which both use "Gerrish."  [R. 16, 351].

around 2008 due to a back injury.  [R. 23, 44–45, 49, 60–61].  He then worked only sporadically until 2014.  [R. 19].

### D.    Relevant Medical Evidence

#### 1.    History of Back and Leg Pain

Since at least 2008 through his date last insured, Claimant has been treated for back and leg pain, among other symptoms, by several different physicians.

A December 2008 MRI of Claimant's back showed a "moderate-sized, central to right lateral disc herniation" at the right L5 nerve root and "mild bilateral foraminal narrowing."  [R. 405].  The MRI also revealed "small-to-moderate broad-based disc herniation" at L5-S1.  [R. 406].  On January 16, 2009, Dr. Julien Vaisman evaluated Claimant, who was complaining of back and right lower extremity pain that began as a work-related injury and was recently aggravated after he lifted a snow mobile.  [R. 686].  According to Dr. Vaisman's notes from the visit, Claimant described having significant leg pain that was "sharp, shooting, and stabbing" and that relief from the pain could be "obtained by massage."  [R. 686].  Dr. Vaisman reviewed the December 2008 MRI and found "[t]here is evidence of disc extrusion at L4-5,"  "disc herniation at L5-S1," and  "disc degeneration L4-5, L5-S1."  [R. 687].  He diagnosed Claimant with a "displacement of lumbar intervertebral disc" with "slight give-away weakness [and] [s]ignificant L5 symptoms" and recommended a transforaminal lumbar epidural injection at L5 as treatment.  [R. 687].  A few days later, on January 19, 2009, Dr. Shapur A. Ameri examined Claimant, who continued to complain of right lower extremity pain and low back pain.  [R. 677–78].  Dr. Ameri observed that Claimant had a "normal gait," and that his spine and lower extremities all had normal ranges of motion, muscle strength and tone, and stability.  [R. 679–80].

In May 2009, Claimant went to the emergency department at the Lahey Clinic after a bicycle accident and complained of "moderate pain in the right lower extremity" and "severe pain in the lower back." [R. 435]. The attending healthcare provider observed that Claimant had "vertebral point tenderness" but no motor or sensory deficit. [R. 436]. At a June 2009 appointment following the accident, a physician observed that Claimant had normal strength and sensation with no tenderness in his back. [R. 420]. On September 3, 2009, Claimant again visited a doctor due to his continuing back pain, which had been aggravated while he was carrying a cast iron tub at his home. [R. 662]. The notes from that visit explain that his lower back pain was exacerbated by his work as an electrician, which required standing on ladders and reaching overhead, he was having difficulty sitting due to low back pain radiating into his right lower extremities, and his feet were cold and tingling. [R. 662]. During that visit, Claimant had to kneel on the floor due to discomfort. [R. 662]. Another MRI was performed on September 10, 2009, which showed "a large right paracentral disc protrusion" at L4-L5, affecting the traversing nerve roots. [R. 461–62]. It also showed a "small left lateral disc protrusion" at L5-S1 that was "likely affecting" the left S1 nerve root, along with foraminal narrowing bilaterally at L4-5 and L5-S1. [R. 462].

On November 9, 2010, Dr. Sharon Stotsky examined Claimant. [R. 601–02]. The examination revealed tenderness in the lumbar spine and decreased range of motion, but no swelling or deformities. [R. 602]. Dr. Stotsky also observed an abnormal gait. [R. 602]. Claimant returned to Dr. Stotsky on November 15, 2010 due to severe right leg pain. [R. 599]. Dr. Stotsky again observed an abnormal and painful gait. [R. 600].

Claimant was then referred to Dr. Bernard Pfeifer, who evaluated him on November 24, 2010, and observed that Claimant's back was "exquisitely tender" and that he had a positive

straight leg raise, but his strength and sensation were "intact."  [R. 632].  At that appointment, Claimant explained that this episode of back and leg pain began when he picked up his infant child and then tried to help his mother push a car.  [R. 632].  Dr. Pfeifer recommended another MRI and surgery.  [R. 633].  A December 20, 2010 MRI confirmed a "[s]table large right paracentral L4-L5 disc extrusion," an "[i]nterval increase in the size [of the] central L5-S1 disc extrusion," and "[a]ccelerated degenerative facet disease for [Claimant's] age."  [R. 800].  Dr. Pfeifer performed Claimant's back surgery on January 18, 2011, [R. 628], and during a follow-up visit ten days later noted that Claimant was doing well and, in the time since his surgery, he was able to lift wheels when working on a boiler at his home, [R. 627].  Dr. Pfeifer noted that Claimant's leg was "settling down nicely" and that he had "good strength" and "intact sensation."  [R. 627].  On March 8, 2011, Dr. Pfeifer again noted that Claimant was doing "quite well" with "no root tension signs," "good strength" and "good spinal motion."  [R. 626].  Claimant also reported lifting branches after a snowstorm.  [R. 626].  Two days later Claimant visited Dr. Andrew Kowal for pain management.  Dr. Kowal noted that the surgery was "very successful" and "significantly alleviated his sciatic symptomology."  [R. 625].  At another appointment on April 28, 2011, Dr. Kowal wrote that Claimant was having difficulty sleeping, but also explained that "[p]ain is not really his major issue now."  [R. 619].  On November 3, 2011, Clamant reported continuing pain on his right side to Dr. Pfeifer, but the pain was "not disabling."  [R. 807–08].  Dr. Pfeifer observed that Claimant "move[d] better than [he] had ever seen him," and that his "strength exam [was] good," but that he did "exhibit a positive straight leg raise."  [R. 808].  Dr. Pfeifer ordered another MRI.  [R. 808].

On June 4, 2012,  Dr. Pfeifer examined Claimant again, and observed "good strength" and no atrophy, but recorded that Claimant continued to have back pain although the surgery

"relieved his leg pain."  [R. 809–10].  Claimant complained that he was finding it hard to do heavier electrician jobs because, even though he could "power through" them, he felt pain afterwards.  [R. 809].  Dr. Pfeifer noted that given his back pain and degenerative disc issues, "it [was] reasonable to put some restrictions on his ability to do heavy lifting and twisting."  [R. 810].  Claimant returned to Dr. Pfeifer the following month with residual back pain and Dr. Pfeifer determined that he was unable to lift heavy pipes, which was required for electrician work.  [R. 811].  At that visit, Dr. Pfeifer wrote a note for Claimant stating that he could not do any "heavy lifting or repetitive forward bending or keeling."  [R. 545, 550].  On September 17, 2012, Claimant complained of back pain again, although he reported that the pain "[did] not radiate down his legs."  [R. 812].  Dr. Pfeifer wrote another note stating that Claimant's condition was not improving and placing limitations on his lifting, "every repetitive forward bending," and kneeling.  [R. 544, 548].  On November 19, 2012, Dr. Pfeifer diagnosed Claimant with "post-laminetcomy syndrome of the spine" and provided him with another note excusing him from work.  [R. 551, 612, 813].  On January 21, 2013, Dr. Pfeifer noted that Claimant had more upper back pain but reported that "his spinal motion [was] good" and he was "neurologically good."  [R. 611, 815].  He also provided Claimant with another note stating that he could not work for two months and could not perform any lifting, bending, or kneeling.  [R. 542, 611, 815].

Claimant was next referred to Dr. Sharon Bassi at the Neurosurgery Clinic at Lahey Health on March 6, 2013.  [R. 608].  Dr. Bassi observed that Claimant's "strength and sensation of the lower extremities is overall largely preserved," his "gait is fluid and nonantalgic," and he "is able to heel and toe walk without difficulty."  [R. 609–10].  At the Claimant's request, she provided him with "a one time note" that excused him from work for the next two months.  [R.

537, 610].  On March 28, 2013, Plaintiff returned to Dr. Pfeifer with more complaints of persistent pain down his leg, [R. 607], and Dr. Pfeifer excused him from work for two months, [R. 538–39].

On August 29, 2013, Dr. Bassi performed a L4-L5, L5-S1 transforaminal epidural steroid injection.  [R. 827].  Dr. Bassi's notes from an October 2, 2013 visit explain that Claimant's leg pain had "essentially resolved," but that he still had significant pain across the lower back and was struggling to perform his job duties.  [R. 829–30].  Consistent with his prior visits, she observed that he was "able to heel toe walk without difficulty" and that "strength and sensation of the lower extremities is overall preserved," but now noted that "[t]here is tenderness" in the lower back.  [R. 831].  On December 4, 2013, Dr. Bassi wrote that Claimant continued to struggle with back pain, and administered another epidural steroid injection, while also asking him "to increase his activity level and continue with regular exercise and stretching."  [R. 833–34].  Dr. Bassi administered another injection on February 14, 2014.  [R. 836].  On March 31, 2014, Dr. Bassi's records indicate that the steroid injections "seem to provide [Claimant] with good relief" and that his right leg pain has improved overall, but that he was now complaining of "neuropathic changes" in both feet with chronic numbness in his right leg, left-sided buttock pain, and left foot pain.  [R. 839].  Dr. Bassi concluded that the left pain was due to issues unaddressed by the back surgery, but also observed that Claimant was "able to heel and toe walk" and that "strength and sensation seem[ed] overall intact except for diminished sensation to light touch in the right lateral aspect of the leg."  [R. 839].  She recommended a surgical consult and an updated lumbar MRI, and provide another note excusing him from work for two more months.  [R. 840].

8

On April 4, 2017, Claimant visited Dr. Joseph Costagliola at Lahey Health and complained of continued back pain and pain down both legs. [R. 1012]. Dr. Costagliola recommended an MRI, [R. 1013], which was performed on April 14, 2017 at the Lahey Clinic, [R. 1009]. The MRI showed "interval progression of degenerative disc disease at L4-5 and L5-S1" and foraminal narrowing. [R.1010]. On April 28, 2017, Claimant saw Dr. Peter Dempsey and complained of pain across his lower back and both legs. [R. 1006]. Dr. Dempsey noted Claimant's apparent discomfort in the chair, but observed "full strength in his lower extremities" and that "sensation is intact to light touch." [R. 1007].

2.      Lyme Disease and Other Joint Pain

In addition to his back and leg pain, Claimant was also diagnosed with Lyme Disease in 2009. [R. 19]. On October 21, 2009, due to symptoms believed to be related to Lyme Disease, Claimant was advised to continue taking antibiotics and was referred to Dr. John Dickason, an infectious disease specialist. [R. 660, 725]. In November 2009, Dr. Dickason observed that Claimant was experiencing memory problems and, after concluding that prior antibiotics had not been effective, placed him on intravenous antibiotics for 30 days, which led to a "favorable response." [R. 634]. The Lyme Disease symptoms began to reoccur by June 3, 2010, [R. 656], but a September 2011 test was "non-reactive" for Lyme Disease. [R. 444]. Claimant reported Lyme-type symptoms again in 2015. [R. 724–25].

On February 9 and 22, 2017 Claimant saw rheumatologist Dr. Matthew Axelrod and reported that his pain was now most prominent in his hands and knees. [R. 869–71]. He described that his fingers were swollen, stiff, and painful, which prevented him from gripping or opening jars. [R. 869–71]. On July 31, 2018, Dr. Jean Barry examined Claimant and found that he had decreased grip strength in his hands due to finger swelling. [R. 896–97]. On August 11,

2018, a doctor[4] completed a Medical Assessment of Ability to do Work-related Activities (Physical) Form and concluded that Claimant had no ability to lift and carry; could not climb, stoop, crouch, kneel, or crawl; and could balance only occasionally.  [R. 876–77].

3.     State Agency Review of the Medical Record

Since Claimant first applied for SSDI,[5] three state-appointed medical consultants have analyzed his medical record.  First, in August 2013, Dr. Rosario Palmeri reviewed his record and concluded that his degenerative disc disease was severe but did not satisfy the conditions for Listing 1.04 in the Social Security regulations and he was not disabled.  [R. 74, 77].  Dr. Palmeri also concluded that Claimant could occasionally lift up to twenty pounds; frequently lift up to ten pounds; stand or walk for six hours a day; sit for six hours a day; frequently climb ramps and stairs and balance; and occasionally climb ladders, ropes, or scaffolds, stoop, kneel, crouch, and crawl.  [R. 74–75].  Dr. Palmeri also found Claimant had no manipulative limitations.  [R. 75].  Second, in May 2017, Dr. Richard Goulding concluded that Claimant could occasionally and frequently lift weights of ten pounds; stand or walk for about two hours per day; sit for about six hours a day; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and should avoid concentrated exposure to extreme cold, vibration, and hazards.  [R. 93–94].  Third, in July 2017, Dr. John Benanti confirmed the limitations assigned by Dr. Goulding.  [R. 103–06].

---

[4] Claimant asserts that this form was completed by Dr. Axelrod, [ECF No. 16-1 at 8], but the ALJ stated it was completed by Dr. Barry, [R. 22–23].  The signature on the form is illegible, but no party disputes that a doctor did indeed complete this form.

[5] Prior to his February 2017 application, Claimant also applied for benefits under the Act in June 2013, but those applications were denied.  [R. 36].

### E.    The Hearing

On April 24, 2019,  a hearing was held before the ALJ.  [R. 33–69 (hearing transcript)].

Appearances at the hearing were made by Claimant, his attorney representative, and VE Gerrish.

### 1.    Claimant's Testimony

Claimant testified that his last performance of full-time work was in 2008.  [R. 49].  He

attempted data entry work in 2014 in an office setting but was only able to work for 6–8 weeks

because absenteeism related to his medical conditions caused him to leave.  [R. 50–51].

Claimant testified that he found sitting during this job very difficult and he had to adjust his

position frequently.  [R. 50–51].  He also testified that his back surgery in 2011 did not improve

his condition significantly and that he understands that he had a "failed back surgery."  [R. 50].

He described his recurring, post-surgery leg pain that extends to the balls of his feet.  [R. 52].  He

also finds it painful to sit for more than 10–12 minutes a day and can only resume sitting after

taking an hour break, during which time he would need to lay down flat.  [R. 52].  His standing

tolerance is similarly limited and he is only able to stand for "a short period of time" before back

pain requires him to readjust his position.  [R. 52–53].  He also finds it painful to lean forward,

stoop, or twist.  [R. 56].

Aside from his back and leg pain, Claimant recounted that he contracted Lyme Disease in

2008, which impacts his concentration, and since at least 2013 he has had trouble gripping

anything due to pain in his fingers and wrist joints caused by Rheumatoid Arthritis.  [R. 56–58].

At home he will lie flat and use a traction device to stretch out his spine, and also treats his pain

with heat, warm showers, and ice.  [R. 58].  He is generally unable to sleep uninterrupted for

more than an hour or two due to his pain and he can only sleep on his back.  [R. 58–59].  His

inability to sleep leads to fatigue during the day and requires him to nap.  [R. 58–59].

2.     VE's Testimony

VE Gerrish testified after Claimant.  She began by characterizing Claimant's past jobs based on the Dictionary of Occupational Titles ("DOT") as follows: electrician (DOT No. 824.261-010, medium work, SVP 7) and electrician helper (DOT No. 829.684-022, medium work, SVP 3).  [R. 60–61].  She was then asked whether a hypothetical individual could perform any of Claimant's previous jobs if that individual had the same age, education, and work history as Claimant and could "lift 20 pounds occasionally, 10 pounds frequently[,] . . . . stand, walk, and sit six hours per day [,]. . . . could frequently climb stairs and ramps, occasionally climb ladders, ropes, and scaffolds. . . .[and c]ould frequently balance, occasionally stoop, kneel, crouch, and crawl[,]" but would need to "avoid concentrated exposure to cold temperatures, and also would need to avoid concentrated exposure to vibration, to vibratory tools, and to unprotected heights."  [R. 61].  VE Gerrish testified that such a person could not perform Claimant's past work, [R. 61], but could perform the job of counter attendant, mail clerk, and fast-food worker, [R. 62].  Next, the ALJ asked VE Gerrish about a hypothetical individual who had the same age, education, and work history as Claimant and could "lift 10 pounds occasionally and frequently[,] . . . . stand and walk for two hours each per day[,] . . . . .sit for six hours per day[,]  . . . [could] occasionally climb stairs and ramps, never climb ladders, ropes, and scaffolds[,]. . . [c]ould occasionally balance, stoop, kneel, crouch, and crawl[,] . . . . [and] could frequently handle and finger[,]" but "would need to avoid concentrated exposure to cold temperatures [and] to vibration, to vibratory tools, and to unprotected heights."  [R. 62–63].  VE Gerrish again testified that such a person could not perform Claimant's past work, [R. 63], but could perform the job of charge account clerk, final assembler, and order clerk in food and beverage, [R. 63].  Finally, VE Gerrish was asked about a third hypothetical individual with the

same age, education, and work history as Claimant who, "because of back pain . . . would need to alternate between sitting and standing," such that the individual would sit for twenty minutes, then stand for five minutes, and then sit again for another twenty minutes, and would also need a break every two hours. [R. 63–64]. VE Gerrish testified that such a person could perform the job of charge account clerk, order clerk in food and beverage, linen grader, and parking lot attendant. [R. 64]. When asked by Claimant's counsel, VE Gerrish acknowledged that the identified occupations required an individual to be on task at least 95% of the time and that being absent three or four days a month due to a disability would be unacceptable. [R. 66].

### F.      The ALJ's Decision

On July 3, 2019, the ALJ issued a decision finding that, under the five-step sequential evaluation process, Claimant was not disabled under the Act. [R. 13–31]. At Step One, the ALJ determined that Claimant had not engaged in substantial gainful activity since the amended onset date of December 31, 2013 through June 30, 2014. [R. 19]. At Step Two, she determined that Claimant's "severe" impairments are "degenerative disc disease of the lumbar spine, *status post* right hemilaminectomy and discectomy of the L4-L5 level." [R. 19]. The ALJ found that there was "little evidence" that Claimant's other alleged ailments—"a history of Lyme disease, high cholesterol and hypertension"—"result[ed] in more than minimal, if any, limitation in the [C]laimant's ability to perform work-related activities during the relevant period." [R. 19].

At Step Three, the ALJ determined that Claimant does not have an impairment, or combination of impairments, that equals a listed impairment. [R. 19]. In making this determination, she considered Listing 1.04 (disorders of the spine) in Appendix 1 to Subpart P of Part 404 of 20 C.F.R. [R. 20]. She noted that the record showed the presence of degenerative disc disease, but did not show evidence of nerve root compression, spinal arachnoiditis, or

lumbar spinal stenosis.  [R. 20].  Accordingly, she determined that the "specific findings required

by the listing are not demonstrated."  [R. 20].  Before considering Step Four of the sequential

evaluation process, the ALJ found the following with respect to Claimant's residual functional

capacity ("RFC"):

> After careful consideration of the entire record, I find that, through the date last
> insured, the claimant had the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except: he can lift or carry 20 pounds occasionally
> and 10 pounds frequently; stand, walk, or sit for six hours in an eight-hour workday;
> frequently climb stairs and ramps; occasionally climb ladders, ropes, or scaffolds;
> frequently balance; and occasionally stoop, kneel, crouch, and crawl. Lastly, he
> should avoid concentrated exposure to cold temperatures, vibration, vibratory tools,
> and unprotected heights.

[R. 20].  She concluded that "the record as a whole fails to support [Claimant's] alleged

limitations as described."  [R. 21].  In making this finding, she explicitly reviewed the medical

records from Drs. Pfeifer, Bassi, and Barry and the findings of the State Agency physicians who

had reviewed Claimant's records.  She described her reasons for giving: (1) partial weight to Dr.

Pfeifer's opinion, [R. 21], (2) significant weight to State Agency physician Dr. Palmeri's

opinion, [R. 22], and (3) little weight to notes that excused Claimant from work activity, Drs.

Barry, Goulding, and Benanti's opinions, and reports from Claimant's family members, [R. 22–

23].  As to Claimant's testimony and its credibility, she concluded that "[C]laimant's medically

determinable impairments could reasonably be expected to cause the alleged symptoms[,]" but

found that his statements regarding "the intensity, persistence and limiting effects of these

symptoms" was not "entirely consistent" with the medical records and other evidence.  [R. 20–

21].  At Step Four, the ALJ found that Claimant was unable to perform his past relevant work as

an electrician and electrician helper.  [R. 23–24].  At Step Five, the ALJ found that, "[t]hrough

the date last insured, considering the [C]laimant's age, education, work experience, and residual

functional capacity, there were jobs that existed in significant numbers in the national economy

that [C]laimant could have performed," including counter attendant, mail clerk, fast-food worker, linen grader, parking lot attendant, charge account clerk, final assembler, and order clerk.  [R. 24–25].  Accordingly, the ALJ concluded that Claimant was not disabled under the Act.  [R. 25].

## II.        STANDARD OF REVIEW

This Court has jurisdiction pursuant to section 205(g) of the Act, 42 U.S.C. § 405(g). Section 205(g) provides that an individual may obtain judicial review of a final decision of the Commissioner by instituting a civil action in federal district court.  See 42 U.S.C. § 405(g). Under sentence four of section 205(g), the court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing."  Id.  A court's decision under sentence four, however, can be based only on a review of the administrative record of proceedings before the Commissioner.  See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147–48 (D. Mass. 2011) (quoting 42 U.S.C. § 405(g)).

Under section 205(g), sentence four, this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  In conducting such review, the Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the court's review of the Commissioner's conclusions of law is de novo.  Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.").

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's

factual determinations.   And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation marks and citations omitted).  The Court "must affirm the [Commissioner's] resolution, *even if the record arguably could justify a different conclusion*, so long as it is supported by substantial evidence." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (emphasis added) (citing Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981)).

## III.     DISCUSSION

Claimant asserts that the ALJ's determination should be reversed for four reasons: (1) the ALJ's conclusion that Claimant's back and radicular conditions did not meet a listed impairment was not based on substantial evidence; (2) the ALJ erred at Step Two in determining which of Claimant's impairments were "severe impairments"; (3) the ALJ failed to accord proper weight to the opinions of Claimant's treating physicians and medical evidence, and instead improperly relied on a non-examining State physician's opinion; and (4) the ALJ's RFC conclusion that Claimant was capable of performing light work is not based on substantial evidence.  See [ECF No. 16-1].  The Acting Commissioner contends that the ALJ's decision should be affirmed because she correctly applied the law and the decision was supported by substantial evidence. See generally [ECF No. 23].  As explained below, the Court finds that Claimant's stated grounds for reversal are without merit, and therefore affirms the ALJ's decision.

### A.     Substantial Evidence for the Listed Impairment Finding

The ALJ determined that Claimant's severe impairments did not meet the requirements of Listing 1.04, finding that "the medical record does not show evidence of nerve root

16

compression" although it "shows the presence of degenerative disc disease that imposed some limitations on the [C]laimant's physical functioning." [R. 20). Claimant argues that the longitudinal medical record contains substantial evidence of an impairment or combination of impairments that met or medically equaled the severity of Listing 1.04. [ECF No. 16-1 at 11–13]. Criteria A of Listing 1.04 requires

> *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).[6]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Claimant has "the burden of showing that he satisfied a Listing by showing that he satisfied the Listing's specific criteria." Arrington v. Berryhill, No. 17-1047, 2018 WL 818044, at *1 (1st Cir. Feb. 5, 2018) (first citing 20 C.F.R. § 404.1525(c)(3) then citing Torres v. Sec'y of Health & Human Servs., 870 F.2d 742, 745 (1st Cir. 1989)). Further, to sustain his burden, Claimant "must have suffered, or be expected to suffer, all the elements of a listed impairment continuously for twelve months." Myers v. Berryhill, No. 18-cv-30122, 2019 WL 3976017, at *15 (D. Mass. Aug. 21, 2019) (internal quotation marks omitted); Ortiz v. Astrue, No. 12-cv-11359, 2013 WL 772677, at *4 (D. Mass. Feb. 27, 2013).

---

[6] Although Listing 1.04 also contains a "Criteria B" and "Criteria C," Claimant focuses only on the requirements to satisfy Criteria A of Listing 1.04, and therefore the Court limits its analysis to Criteria A.

Claimant argues that, contrary to the ALJ's finding, there is evidence of nerve root compression and all of the other elements of Listing 1.04A.  [ECF No. 16-1 at 11–13].  A review of the record, however, demonstrates that, at minimum, there is no evidence Claimant suffered from "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss" for twelve months.  Although Claimant argues that "the medical record is replete with references to sensory loss in the form of numbness and tingling in the lower extremities and[,] as far back as 2009, the Plaintiff was exhibiting give away weakness," he cites only to Dr. Vaisman's January 2009 examination note.  [ECF No. 16-1 at 13].  This single citation is insufficient to find that the ALJ's conclusion was not supported by substantial evidence.  In fact, that same month Dr. Ameri observed that Claimant's spine and lower extremities all had normal ranges of motion, muscle strength and tone, and stability, [R. 679–80], and, just a few months later in May 2009, a healthcare provider at Lahey Health observed no motor or sensory deficit, [R. 435–36].  In June 2009, Claimant's medical records document normal "strength/sensation."  [R. 420].  Overall, contrary to Claimant's assertion, the medical record is actually replete with findings of normal strength and sensation throughout 2010 to 2014.  [R. 632 (November 2010), 627 (January 2011), 626 (March 2011), 808 (November 2011), 809–10 (June 2012), 609–10 (March 2013), 831 (October 2013), 839 (March 2014 record noting strength and sensation were intact "except for diminished sensation to light touch" in right leg)].  In the absence of evidence demonstrating motor loss and sensory loss for at least twelve months, the ALJ did not err in finding that the requirements of Listing 1.04 were not satisfied.  Thus, this challenge does not provide a basis for remand.

### B.    The Step Two Severe Impairment Analysis

Claimant also contends that the ALJ's Step Two finding that his only severe impairment was his lumbar spine condition ignores the substantial evidence in the record that he also suffered from associated radicular symptoms in both legs.  [ECF No. 16-1 at 13–15].  According to Claimant, if this impairment were properly considered, it would have resulted in a determination that he was disabled.  [Id. at 15].  The Acting Commissioner argues that any failure to discuss radicular symptoms at Step Two is harmless and not grounds for remand because radicular symptoms were considered when the ALJ determined the RFC.  [ECF No. 23 at 17].  The Acting Commissioner has the better argument here.

Step Two of the five-step process is understood to be a "de minimis policy" for determining whether a claimant has brought a claim with merit and "do[es] no more than screen out groundless claims."  McDonald v. Sec'y of Health and Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  Although the absence of a severe impairment at Step Two ends the inquiry, once there is a finding of any severe impairment, the ALJ is instructed, in determining the claimant's RFC, to "consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe."  20 C.F.R. § 404.1545; see also Viveiros v. Astrue, No. 10-cv-11902, 2012 WL 4104794, at *9 n.4 (D. Mass. Sept. 19, 2012).  "[A]s long as the ALJ [finds] at least one severe impairment so that the sequential evaluation progress[es] to the next step, an error at Step Two does not require reversal."  Dunham v. Astrue, No. 10-cv-40246, 2013 WL 1192406, at *8 (D. Mass. Mar. 21, 2013); see also Perry v. Astrue, No. 11-cv-40215, 2014 WL 4965910, at *4 (D. Mass. Sept. 30, 2014) ("Here, any error at step two was harmless because the evaluation proceeded past step two and the ALJ considered all of Plaintiff's impairments at step four.").

It is undisputed that at Step Two the ALJ found that Claimant had a severe impairment and the analysis progressed.   [R. 19].  Even assuming error, reversal or remand is unwarranted on the basis of the ALJ's alleged failure to conclude that Claimant's radicular symptoms were a severe impairment.  The ALJ plainly considered impairments beyond his lumbar spine condition, including his radicular symptoms, when determining if Claimant was eligible for benefits.  The ALJ's opinion notes the existence of Claimant's leg pain, but also recognized that Dr. Bassi wrote that Claimant had obtained "'remarkable benefit' from right-sided L4-L5 and L5-S1 transforaminal epidural steroid injection, with delayed onset of right leg pain" and that in March 2013 Dr. Bassi's notes reflect that Claimant's leg pain was only a 3 out of 10 on the pain scale. [R. 21].  Thus, the radicular symptoms were reviewed and analyzed by looking to the relevant medical records.  Claimant also notes that he testified to the extent of his leg pain, which he argues was ignored, but the ALJ plainly considered his testimony when making a factual finding that his testimony was not entirely consistent with the medical record evidence.  [R. 21].  Thus, the ALJ's conclusion that Claimant's only severe impairment was his lumbar spine condition is not grounds for reversal.

### C.    Application of the Treating Physician Rule

Claimant next argues that the ALJ improperly applied the "treating physician rule" when she failed to accord proper weight to Dr. Pfeifer and Dr. Bassi's opinions.  [ECF No. 16-1 at 15–18].  Claimant asserts that the record demonstrates that Dr. Pfeifer (1) found as early as September 2012 that Claimant was unable to perform any repetitive bending or kneeling; (2) opined again in January 2013 that Claimant was incapable of any lifting, bending, or kneeling; and (3) continued to excuse him from work in April 2013.  [ECF No. 16-1 at 15]; see also [R. 538 (April 2013 doctor's note), 542 (January 2013 doctor's note), 548 (September 2012 doctor's

note), 815 (January 2013 medical record stating that Claimant was "unable to do his usual occupation")]. Dr. Bassi reported in 2013 that Claimant's surgery did not alleviate his symptoms and that he continued to suffer from low back and bilateral radiating lower extremity pain, and she also wrote him a note excusing him from work for two months. [R. 487–89].[7] The ALJ, according to Claimant, erred by assigning these opinions little, if any, weight and instead assigning great weight to the opinion of Dr. Palmeri who concluded that Claimant suffered from degenerative spine changes, but could still perform light work with environmental and postural limitations. [ECF No. 16-1 at 16]; see also [R. 22].

For claims filed prior to March 27, 2017, the treating physician rule, codified at 20 C.F.R. § 404.1527, states that, "[g]enerally, [the agency] will give more weight to the medical opinion of a source who has examined [a patient] than to the medical opinion of a medical source who has not examined [the patient]." 20 C.F.R. § 404.1527(c)(1). This deference to the opinion of treating sources, however, is not absolute. Coggon v. Barnhart, 354 F. Supp. 2d 40, 52 (D. Mass. 2005). Controlling weight is granted unless the ALJ finds that a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or that it is "inconsistent with other 'substantial' evidence in the record." DeBlois v. Astrue, No. 07-cv-11685, 2008 WL 2484836, at *5 (D. Mass. June 13, 2008) (quoting 20 C.F.R. § 404.1527(c)(2)). Even if the opinion of a treating source is found to conflict only with the opinions of non-treating sources, the ALJ may still reject the treating source's opinion as controlling. Coggon, 354 F. Supp. 2d at 54. When an ALJ is determining whether a treating source's opinion should be given controlling weight, the opinion "must be weighed using all of the factors provided in 20

---

[7] Claimant contends that Dr. Bassi's medical notes from 2013 and 2014 pronounce that she considered him "totally disabled." [ECF No. 16-1 at 15–16 (citing R. 487, 839)]. These medical notes do not include such an opinion and thus do not support Claimant's argument.

C.F.R. 404.1527 and 416.927."  Id. at 52 (quoting Titles II and XVI: Giving Controlling Weight

to Treating Source Medical Opinions, 61 Fed. Reg. 34490, 34491 (July 2, 1996)).  These factors

include:

> (1) the examining relationship, (2) the treatment relationship, including the length, nature, and extent of treatment and the frequency of examination; (3) supportability of the opinion by evidence; (4) consistency with the record; (5) the specialization of the treating source, and (6) any other factors which support or contradict the opinion.

Id. (quoting 20 C.F.R. § 416.927(d)); see also 20 C.F.R. § 404.1527 (listing same factors).

Regulations require an ALJ to "provide a 'good reason' for the weight [afforded] to the opinions

of treating sources."  DeBlois, 2008 WL 2484836, at *5.  The First Circuit has held, however,

that an ALJ is not required to "expressly address each of the factors provided in

§ 404.1527(c)(2)" in explaining how much weight he or she affords the opinion of a treating

source.  McNelley v. Colvin, No. 15-01871, 2016 WL 2941714, at *2 (1st Cir. Apr. 28, 2016)

("The ALJ also did not err by failing to expressly address each of the factors provided in

§ 404.1527(c)(2) in discussing [the treating source's] medical opinions. . . . He was not required

to expressly mention each factor."); see Pelletier v. Astrue, No. 09-cv-10098, 2012 WL 892892,

at *4 (D. Mass. Mar. 15, 2012) ("Good reasons can be provided by discussing just one [20 CFR

§ 404.1527(c)] factor.").

The Acting Commissioner argues that the ALJ's decision makes clear that she properly

weighed and considered the opinion evidence, and thus did not err in giving less weight to his

treating physicians' opinions.  [ECF No. 23 at 11–20].  The Court agrees.  The ALJ's opinion

clearly shows that she reviewed the medical records from Drs. Bassi and Pfeifer and explained

her reasons for providing them little weight, which included their inconsistency with the other

medical records.  [R. 20–23].  These conclusions are supported by substantial evidence.

Although Dr. Pfeifer opined on Claimant's lifting, bending, and kneeling limitations in 2012 and 2013 and provided him with notes to excuse him from work, Claimant was also encouraged to be physically active and avoid bed rest.  [R. 21].  Further, Dr. Pfeifer's most recent note only excused Claimant from work for a two-month period, not indefinitely.  [R. 538–39].  Regarding Dr. Bassi, although Claimant contends that her medical notes say that Claimant continued to be in pain, the ALJ found it significant that in 2013 and 2014 Dr. Bassi observed that Claimant could "heel and toe walk without difficulty and that strength and sensation of the lower extremities were preserved;"  his condition was "unremarkable;" and he was getting relief from the two epidural steroid injections he received.  [R. 21].  These medical records substantially support the ALJ's finding that Claimant's "objective clinical presentation was consistently quite mild and fails to support" limitations beyond what was contemplated in the ALJ's RFC.  [R. 21]. In contrast, the ALJ determined that Dr. Palmeri's analysis was consistent with the medical evidence.  [R. 22].  Accordingly, when determining the weight to give to Claimant's treating physicians, the ALJ compared the consistency of their opinions to the medical evidence and gave good reasons for the weight afforded to them.  Therefore, the ALJ did not violate the treating physician rule by determining that significant weight should be given to Dr. Palmeri's findings.

### D.    Substantial Evidence for the RFC Finding

Claimant's final argument is that the ALJ's finding that he retained the RFC to perform light work is not supported by the evidence.  [ECF No. 16-1 at 18–20].  He points to (1) Dr. Pfeifer's 2013 opinion stating that Claimant was incapable of lifting, bending, or kneeling as well as his own testimony that he has "excruciating pain when he leans forward" and that he "can't stoop at all"; (2) the medical records showing his severe leg pain symptoms, which establish that he cannot perform frequent stair and ladder climbing activity; and (3) medical

records demonstrating that he is unable to use his hands, which is required for sedentary work. [ECF No. 16-1 at 18–20].

An RFC finding, which is not a medical determination, must be based upon "all the relevant medical and other evidence in [the] case record."  20 C.F.R. § 416.920(e).  An ALJ has the authority to "piece together the relevant medical facts from the findings and opinions of multiple physicians" when making an RFC finding.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).  The ALJ's RFC finding will not be overturned so long as it is supported by substantial evidence.  See Patoski v. Berryhill, No. 18-1904, 2019 WL 2574591, at *1 (1st Cir. June 24, 2019); see also Land v. Comm'r of Soc. Sec., 494 F. App'x 47, 50 (11th Cir. 2012).  As noted above, substantial evidence means "more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Biestek, 139 S. Ct. at 1154.

First, the substantial evidence in the record supports the ALJ's finding that Claimant could perform light work that required bending, lifting, stooping, kneeling, and climbing.  As explained above, the ALJ properly supported her reasons for giving Dr. Pfeifer's opinion on Claimant's limitations only partial weight and instead crediting Dr. Palmeri's opinion that Claimant could engage in in light work.  Thus Dr. Pfeifer's opinion as to Claimant's bending, lifting, and kneeling capabilities alone is not a basis for remand.  Further, the medical record evidence supports the ALJ's findings, including observations that Claimant engaged in lifting before and after his surgery, [R. 272 (describing household chores and childcare duties performed), 458 (heavy lifting at work), 507–08 (lifting branches and boiler after surgery), 675 (lifting at work)], that his strength and sensory functions were intact throughout the relevant period, see Sec. III.A. supra, and that his leg pain improved after surgery and steroid injection

treatments, [R. 625, 627, 808–10, 839].  Further, even if the record did not support the ALJ's

determination that Claimant can stoop, kneel, and climb stairs or ladders, as the Acting

Commissioner points out, any error would be harmless because several of the jobs that the ALJ

found that Claimant could perform do not actually require stooping, crouching, climbing, or

kneeling.  See DOT § 205.367-014, 1991 WL 671715 (U.S. Dep't of Labor 1991) (charge

account clerk); id. § 209.567-014, 1991 WL 671794 (order clerk); id. § 209.687-026, 1991 WL

671813 (mail clerk); id. § 713.687-018, 1991 WL 679271 (final assembler); id. § 915.473-010,

1991 WL 687865 (parking lot attendant).

Second, Claimant's arguments regarding his manipulative limitations do not find support

in the record.  Claimant's brief states that "there is significant record evidence of [his] inability

to use his hands."  [ECF No. 16-1 at 20].  The ALJ reviewed the medical records and opinions

relating to his manipulative limitations, such as swollen fingers and potential arthritis, but

explicitly stated such symptoms did not factor into her RFC analysis because "these functional

deficits were not present in the period prior to the date last insured" and they ultimately "would

have little to no effect on the occupational base."  [R. 22–23].  Claimant has not pointed to any

medical records relating to stiffness and swelling in his fingers prior to the date last insured, and

a review of the medical records, as well as all Claimant's own briefing, indicates such reports

occurred most frequently in 2017, several years after the date last insured.  See [ECF No. 16-1 at

7–8 (Claimant's brief documenting finger and hand pain beginning in 2017)]; [R. 91 (state

agency medical report noting 2017 reports of joint pain arthritis and pain in multiple joints); 103

(same); 726 (August 2015 medical record noting only "mild swelling of the digits in the hand

and wrist") 869 (February 2017 medical record), 896 (July 2018 medical record)].  Although

Claimant testified at the hearing that he has had problems with his hands and fingers since 2013,

he has pointed to nothing in the medical record to support that statement.  Thus, these manipulative limitations were not relevant to the ALJ's RFC analysis and do not provide a basis for remand.

## IV.     CONCLUSION

For the reasons stated above, the Court finds that the ALJ's decision was supported by substantial evidence and therefore Claimant's motion to reverse and remand, [ECF No. 16], is <u>DENIED</u> and the Acting Commissioner's motion to affirm is <u>GRANTED</u>, [ECF No. 22].

**SO ORDERED.**

March 28, 2022                                                    /s/ Allison D. Burroughs
                                                                 ALLISON D. BURROUGHS
                                                                 U.S. DISTRICT JUDGE